UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:08-cr-101 |
| | ) | Judge Collier/Carter |
| BASILIO JIMENEZ | ) | |
| JOHNNY ESPINAL-BISONO | ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendants Basilio Jimenez's (Jiminez) and Johnny Espinal-Bisono's (Espinal-Bisono)

Motions to Suppress Evidence (Docs. 30 and 32, respectively) have been referred by the District

Court to the undersigned Magistrate Judge for a report and recommendation pursuant to 28

U.S.C.§ 636(b)(1)(B)and(C).  Defendants seek to suppress evidence of six kilograms of cocaine

discovered in their vehicle during a traffic stop along I-75 within the Chattanooga, Tennessee

city limits. Defendants argue that police lacked a valid justification to stop their vehicle, that the

traffic stop exceeded its legitimate purposes, that the subsequent search exceeded the scope of

consent given, and that police ignored their attempts to withdraw consent to search, all actions

which vitiate the validity of the vehicle search at issue.  For the reasons stated herein, it is

RECOMMENDED the defendants' motions to suppress be DENIED.

II. Relevant Facts

An initial evidentiary hearing was held on defendants' motions to suppress in two parts:

on December 22, 2008 and January 12, 2009.  The government presented three witnesses.

Jimenez testified on his own behalf.  A videotape of the traffic stop and an audiotape of the

1

police dispatcher was entered into evidence.

*1. Officer Dale Lockhart*

Officer Dale Lockhart testified to the following: On August 27, 2008, the date of the traffic stop in question, Officer Lockhart was a law enforcement officer with the Chattanooga Police Department where he had been for about five years. He was at that time assigned to highway interdiction and had received training for highway interdiction from the Federal Drug Enforcement Agency. His job included traffic enforcement and contraband interception.

On the evening of August 27, 2008, at approximately 11:00 p.m., Officer Lockhart was traveling eastbound on I-24 within the Chattanooga city limits when he observed a Federal Express 18-wheeler or tractor trailer truck being followed "extremely closely" by a Chrysler Pacifica. At one point in the hearing, in an effort to illustrate just how closely the Pacifica was following the tractor-trailer truck, Lockhart held his hands up no more than twenty-four inches apart. As Lockhart drove up to the Pacifica in the fast lane, the vehicle slowed down quickly, going from approximately 55 mph to "40 something." The Pacifica and the Federal Express truck were in the middle lane. The abrupt reduction in speed was impeding traffic and raised concerns in Lockhart's mind that the driver was sick or impaired. Lockhart then slowed and changed to the middle lane whereupon the Pacifica changed to the fast lane continuing at that speed. Officer Lockhart decided to pull the vehicle over for following too closely, a violation of Tennesse law and a safety hazard, and to find out if the driver was having car trouble or was sick or impaired. Lockhart pulled the Pacifica over shortly before I-24 merges into I-75 which then breaks off south to Atlanta and north to Knoxville.

2

When Officer Lockhart activated his blue lights, his dash mounted camera also activated. The dash camera has a feature whereby it backs up thirty seconds after activation; nevertheless, the tailgating was not captured on tape, only Officer Lockhart following the Pacifica and a tractor-trailer pulling away in the distance.

When the vehicles were both parked on the side of the road with the police car behind the Pacifica, Lockhart walked to the passenger's side and asked the driver for his driver's license and proof of insurance. Lockhart's audio recorder was activated. The traffic noises were very loud. Lockhart testified the driver, Jimenez, was nervous; the passenger, Espinal-Bisono, was whistling and nervous; and Lockhart observed Red Bull energy drinks on the floorboard. The audio recorder picked up Lockhart telling Jimenez, "the reason I stopped you was because you were inches off the back of that Fed Ex truck." Jimenez responded he was trying to "get my exit." Lockhart took his license and insurance information and told Jimenez he needed a new insurance card because his was out of date. Jimenez said the car belonged to his girlfriend. Lockhart went back to his patrol car to run a check on his laptop. He also conducted a tag and registration check. This entire process took six and a half minutes.

Lockhart then asked Jimenez to step back to the front of his patrol car where Lockhart would write him a warning citation. Lockhart testified he wanted Jimenez to exit the vehicle and stand outside to talk with him so that Lockhart could better hear Jimenez over the heavy traffic. Jimenez complied with this request. The audio picks up Jimenez saying something about his exit and his GPS and "that's why." Traffic noise is loud. While Jimenez and Lockhart were standing in front of the patrol car and Lockhart was filling out the warning citation, Lockhart

3

asked Jimenez his name and age. The defendant had no trouble understanding and responding. In fact, the defendant joked with the officer telling him, "you look 29," and "you're a looker." At this point, the traffic stop had been going on for about ten minutes, and Lockhart continued to write the warning citation. Lockhart testified he found Jimenez overly talkative and nervous. Lockhart asked Jimenez where he was coming from and where they were going. Jimenez stated they were coming from Atlanta and going to Connecticut. Jimenez's answer was suspicious to Lockhart because he was traveling on I-24 eastbound which is not consistent with coming from Atlanta. Lockhart continued to try to understand Jimenez's travel plans which made no sense to him. Lockhart asked Jimenez again where he was coming from, and Jimenez again said Atlanta. Lockhart explained to Jimenez that a much better route from Atlanta to Chattanooga would have been I-75. Jimenez then said something about being in Knoxville to see a friend and that he had lost the friend's phone number. Jimenez also said something about taking "181." In response to a question by Lockhart, Jimenez stated Espinal-Bisono was a friend.

Lockhart concluded that Jimenez's explanations of where he was going and where he had come from made no sense. At 12 minutes, 30 seconds into the stop Lockhart decided to talk to the passenger, Espinal-Bisono, in an attempt to confirm or deny his suspicions. Lockhart attempted to converse with Espinal-Bisono for about one minute and 30 seconds but concluded he was unable to speak English. At that time, about 14 minutes into the stop, Sergeant Jason Lewis arrived, and Lockhart spoke to Lewis about the defendants' itinerary. That conversation is not recorded, however, because Lockhart turned his audio recorder off whenever he spoke to Sgt. Lewis – a practice Lockhart testified he learned in training.

4

Immediately after talking to Lewis, about 15 minutes into the stop, Lockhart asked Jimenez if he had anything illegal such as large sums of money, weapons, guns, cocaine or marijuana. Jimenez offered, "no, you can check." Lockhart then asked the defendant, "Do you mind if I search the car?" Jimenez responded, "no, you can check." This exchange is captured on the video and audio tape and reveals no reluctance or hesitation on the part of Jimenez in giving his consent. The traffic stop had been going on at this point a little less than 16 minutes. Lockhart testified he had not finished writing the citation when he asked for consent to search.

Lockhart asked the passenger to step out and stand with Jimenez. The search began 16 minutes into the stop. Sergeant Lewis assisted Officer Lockhart with the search. Lockhart's microphone was off during most of the search. A Tennessee State Trooper who had also arrived on the scene stood with the defendants while Lockhart and Lewis conducted the search. The defendants were not handcuffed and stood on the side of road next to Lockhart's patrol car.

During the search, defendant Espinol-Bisono called out, "hey, can you get my water out of the front seat?" Lockhart responded, "you talk pretty good English." Espinal-Bisono responded, "you taught me." The officers proceeded to conduct a very careful search of the vehicle. At 25 minutes, 30 seconds into the stop, officers moved the Pacifica further away from the interstate and onto the shoulder for safety purposes.

During their interdiction training, the officers were taught to look for "tooled" bolts, bolts which have been taken on and off and therefore have scratches and marks on them to indicate they have been removed and replaced. Between the cargo area and the back seats, a place where a consumer would not be expected to remove bolts, Lockhart noticed bolts that were

5

severely "tooled." He removed the bolts, pulled up the carpet, and saw and smelled fresh paint. These observations made him very suspicious of a hidden compartment. He looked further and found six kilograms of cocaine in a hidden compartment. This discovery occurred about 71 minutes into the traffic stop, 55 minutes after Jimenez gave consent to search.

The videotape itself shows Lewis and Lockhart frequently walking back and forth from the Pacifica to Lockhart's patrol car.[1] The undersigned counted no fewer than eleven instances where one or both of the officers left the Pacifica and walked back in the direction of the patrol car. Often one or both of the officers was at the patrol car more than thirty seconds.

### 2. Basilio Jimenez

Basilio Jimenez testified to the following through a translator: At the time of the stop, Jimenez was a resident of Lynn, Massachusetts. On August 27, 2008, he was driving a Chrysler Pacifica on I-24 eastbound when he was blue-lighted by a police car. His passenger, co-defendant Espinal-Bisono, does not speak English. During the course of the traffic stop, Officer Lockhart asked Jimenez if he possessed any marijuana, cocaine, large sums of money, guns, or weapons. Jimenez told Lockhart he did not and told him he could check. Officer Lockhart asked him if he minded if Lockhart searched his car. Jimenez said he did not mind, and the officer then said, "I am going to take just a quick look." Based on that last statement by Officer Lockhart, Jimenez thought Officer Lockhart would look inside the glove compartment and maybe under the seats for one or two minutes and that would be all. On cross-examination, Jimenez admitted he told Officer Lockhart, even before being asked, that he could check to see if there was

---

[1] Since the video camera is mounted to Lockhart's patrol car's dash, once the officers walk past the patrol car's dash, they are no longer on the video.

6

contraband inside the vehicle. However, Jimenez testified that he meant Lockhart could check his property in the car but not the entire car since he was not the owner of the car.

The video tape shows that seven minutes and 39 seconds into the search, Jimenez approached Sergeant Lewis who was standing near the front passenger side of the Pacifica. The videotape shows Lewis waving Jimenez away. Jimenez testified he approached Sergeant Lewis saying, "excuse me, Officer," to tell Lewis that they had been looking too long and that he and Espinal-Bisono wanted to go on their way. Jimenez testified he wanted to tell Sergeant Lewis to stop searching; however, before he could communicate that desire to Sergeant Lewis, Sergeant Lewis waved him back and told him if he didn't stay back he would close him in the patrol car. The audio tape does not capture any conversation in this incident, only loud traffic noise. Twenty-five minutes, 30 seconds into the stop, the officers moved the Pacifica further off the road and onto the shoulder. Jimenez does not remember an officer asking him if they could move the car. Jimenez testified he tried a second time to approach Lewis while he (Jimenez) was standing beside the patrol car, but Lewis said "no," the state trooper told him not to move, and Lewis put hand-cuffs on him. Jimenez testified the cuffs were placed on him before the cocaine was found. Neither the handcuffs nor the second attempt to talk to Lewis is on the video or audio tape. Jimenez testified he did not attempt to tell the State Trooper he wanted the search stopped because the Trooper told him not to talk.

### 3. Sergeant Jason Lewis

Sergeant Jason Lewis testified to the following: he has fifteen years experience in law enforcement with the Chattanooga Police Department (CPD) and is a supervisor in the Special

Investigations Division. He has five years experience as a supervisor in traffic interdiction. On August 27, 2008, he was called to assist in a traffic stop at the 184 mile marker on I-24 eastbound within the Chattanooga City limits. When he arrived, State Trooper Cecil Harvey and CPD Officer Dale Lockhart were present with the two defendants who were standing unrestrained next to the patrol car. Officer Lockhart briefed Sergeant Lewis about the defendants' self-reported itinerary.  As did Lockhart, Lewis found the itinerary suspicious, and he spoke to Jimenez about it.  Jimenez was very cooperative and said nothing about withdrawing consent to search. Lewis then assisted Officer Lockhart in searching the vehicle while Trooper Harvey watched the defendants who were standing next to the patrol car, unrestrained, by the side of the road. Lewis testified he spoke to Jimenez on several occasions as he went back and forth from the Pacifica to Lockhart's patrol car to retrieve tools and other items needed to continue his search. At no time did Jimenez ask or state that he wanted the search discontinued, nor did Lewis advise the defendants that they had the right to withdraw their consent. He recalls that Trooper Harvey told the defendants several times they were not to speak in Spanish but that they could speak in English. This prohibition against speaking in Spanish was for the officers' safety. He noticed the defendants were fidgety and moving around a lot. He told them to be still and stay in one area but they didn't do so. They were free to converse in English and could have called out to him or Lockhart or spoken to Harvey standing next to them if they wanted to withdraw their consent. At one point Sergeant Lewis walked to the patrol car to get a tool and, as he walked past the defendants, Jimenez asked him if there was some problem, and Lewis said, "yes" and continued back toward the Pacifica. Jimenez then started walking toward him, and

8

Lewis turned around, waved him back, and told Jimenez he needed Jimenez to step back. He did not tell Jimenez he could not talk. For officers' safety, Lewis did not want Jimenez standing over him while he conducted the search, and Lewis thought the defendant had followed him to see what the problem was. The video shows that Lewis walked back to the passenger side of the patrol car several times after the incident where Lewis had waved Jimenez back, the first such occasion occurring only 30 seconds after Lewis waved Jimenez back. After Lewis and Lockhart discovered the "tooled" bolts in the back of the car, Lewis had a conversation with Jimenez about whether the car had been worked on. Not then nor at any point did Jimenez say anything about stopping the search. Lewis testified that at no point were the defendants left alone and they therefore had "plenty" of opportunity to tell one of the officers that they wanted the search stopped.

### 4. State Trooper Cecil Harvey

Tennessee State Trooper Cecil Harvey testified to the following: On August 27, 2008, he was a Highway Patrol Officer covering the counties of Hamilton, Rhea, and Meiggs in Tennessee. He was on his way home when he noticed the traffic stop, saw the officer was alone, and stopped to assist him. The two defendants stood on the side of the road at the right corner panel of Dale Lockhart's vehicle. Harvey was there to watch the men for safety purposes. The defendants continued to speak to each other in Spanish, and he told them to speak only in English. Trooper Harvey was wearing his own audio recording device which clearly recorded him telling the defendants they could talk "all they wanted in English" but that they could not speak in another language. Three times, at least, Trooper Harvey had to tell them not to speak in

9

Spanish. At one point, Harvey told the defendants, I'm not going to tell you anymore." When speaking to Espinal-Bisono, Harvey thought that at first the defendant did not understand him, but then Espinal-Bisono seemed to understand clearly what Harvey was saying. At some point in the search, Jimenez asked for water and then Espinal-Bisono asked for water, both in English. During the middle or last half of the search, Jimenez asked in English if the car would be put back together. Harvey asked Espinal-Bisono what he did for a living and the defendant told him in English he cleaned banks and buildings. Harvey testified that the two CPD officers were continuously walking to and from the Pacifica and the patrol car to get things they needed, a fact documented by the dash camera, and that the defendants talked to the CPD officers as this was going on. Harvey testified that at one point Jimenez walked toward one of the officers near the Pacifica, and Harvey instructed him to come back three times before Jimenez eventually did; however, the officer later walked back and talked to Jimenez. At one point one of the defendants said there was something wrong with his leg, it hurt, and that he couldn't sit down, so Harvey told him to lean up against the patrol car. At no time did either defendant state that he wanted the search to stop or that he was withdrawing his consent for the search.

### III. Discussion

#### *A. Espinal-Bisono's Standing*

The government argues that Espinal-Bisono had no reasonable expectation of privacy in the Pacifica because he has not asserted any possessory interest in the incriminating items found in the Pacifica. Indeed, Espinal-Bisono has presented no evidence whatsoever to support a finding that he had any ownership or possessory interest in or control over either the Pacifica or the incriminating items found in the Pacifica. The undersigned knows only that Espinal-Bisono,

10

a passenger in the Pacifica, was a friend of Jimenez who was allegedly driving his girlfriend's car. This information is insufficient to establish Espinal-Bisono had a legitimate expectation of privacy in the Pacifica. *See Rakas v. Illinois*, 439 U.S. 128 (1979) (holding passengers who asserted neither property nor possessory interest in the automobile searched nor an interest in the property seized and who failed to show that they had any legitimate expectation of privacy in the glove compartment or the area under the seat where the evidence was obtained, were not entitled to challenge the search of those areas.) However, since the United States Supreme Court held conclusively in *Brendlin v. California,* 551 U.S. 249, 255 (2007) that the detention of a vehicle constitutes a seizure under the Fourth Amendment of its driver and all passengers, the Sixth Circuit has concluded a passenger who has been illegally detained in a traffic stop has standing to challenge his detention and to seek suppression of the fruits of the illegal seizure. In *United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir.), *cert. denied* 129 S.Ct. 772 (2008), the court held that while two passengers in a van subject to a traffic stop did not have a reasonable expectation of privacy in the van, they nevertheless had standing to challenge the legality of the traffic stop and detention and argue that evidence found in the van should be suppressed as fruit of the poisonous tree. The court noted that though it has reached a different conclusion regarding a passenger's standing in a similar case in *United States v. Carter*, 14 F.3d 1150 (6th Cir. 1994), that case was decided before the Supreme Court's decision in *Brendlin v. California*, 551 U.S. 249 (2007). *Id.* at 459 n.5. *See also*, *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) ("although a passenger does not have a legitimate expectation of privacy in the searched vehicle, as passenger [a defendant] may still challenge the stop and detention and argue that the evidence should be suppressed as fruits of the illegal activity") (brackets original, internal

11

citation omitted); *accord United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008). Thus, the undersigned concludes Espinal-Bisono has standing to challenge the legality of his detention and have evidence arising out of an illegal detention suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

### B. The Initial Traffic Stop

Both defendants contend Officer Lockhart lacked a sufficient basis under the Fourth Amendment to stop the defendants in the Pacifica, and, therefore, the cocaine found in the Pacifica must be suppressed as evidence at trial. Defendant Jimenez also contends Officer Lockhart stopped them because they are Hispanic, conduct constituting a violation of the Fourteenth Amendment's Equal Protection Clause.

Intentionally applying laws in such a manner as to discriminate against a person on the basis of their race and/or national origin is a violation of the Equal Protection Clause. *Wren v. United States*, 517 U.S. 806, 813 (1996) ("the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment"); *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997) (the Equal Protection Clause prohibits selective enforcement of the law based on considerations such as race.) At the evidentiary hearing, Officer Lockhart denied racial profiling. There was simply no evidence presented at the hearing, such as incriminating statements or statistics, which support this assertion.

The detention of a vehicle constitutes a seizure under the Fourth Amendment of its driver and all passengers. *Brendlin v. California,* 551 U.S. 249, 255 (2007). Police may detain a vehicle and the persons within it based on probable cause to believe that the driver has violated a

12

traffic law. *United States v. Blair*, 524 F.3d 740, 748 (6ᵗʰ Cir. 2008); *United States v. Bradshaw*, 102 F.3d 204, 210 (6ᵗʰ Cir. 1996). The underlying motive of the officer is not relevant to the Fourth Amendment analysis as long as the officer follows the cardinal rule: there must be a valid traffic stop. *Blair*, 524 F.3d at 748 ("police officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop.") (brackets original) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6ᵗʰ Cir. 1995).

Tenn. Code. Ann. § 55-8-124(a) provides:

> The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway.

Officer Lockhart testified the Pacifica was "extremely close" to the Federal Express truck. The audiotape picks up Lockhart telling Jimenez he was within "inches" of the Federal Express truck. During his testimony, Lockhart indicated with his hands that the Pacifica was as close as two feet to the Federal Express truck, and Lockhart testified they were traveling approximately 55 miles per hour. The defendants presented no evidence to the contrary. Further, I find the officer to be credible based on his demeanor and the fact that his testimony as a whole was consistent internally and with the other officers' testimony. Defendants note that the videotape did not show the violation, but Officer Lockhart testified he observed the Pacifica for some time before activating his blue lights which in turn activated his dash camera.[2] Having

---

[2]The undersigned would prefer to have all traffic violations on videotape when evaluating these motions to suppress. But there has been no evidence presented to suggest that the manner in which the dash cameras are activated (upon turning on the blue lights) is a means to avoid taping traffic violations or that the back-up time on the tapes (30 seconds) has also been shortened to avoid capturing the traffic violations on tape.

13

reached this conclusion, the undersigned must determine whether observing a vehicle follow another vehicle about two feet apart on the interstate traveling at 55 miles per hour constitutes probable cause to believe Jimenez violated Tenn. Code. Ann. § 55-8-124(a) .

Defendant Espinal-Bisono argues this case is analogous to a number of cases where the court held a motorist's touching, skirting, or straddling an inside or outside road line was not sufficient to constitute probable cause to stop a motorist for failure to maintain his lane in violation of Tennessee traffic laws. *See e.g., United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000); *State v. Smith*, 21 S.W.3d 251 (Tenn. Crim. App. 1999); *State v. Martin*, 2000 WL 1273889 (Tenn. Crim. App. 2000). Espinal-Bisono further argues that the traffic ordinance at issue in this case is "subjective" and could be used improperly to provide the police with a "stop-at-will standard." (Espinal-Bisono's brief at 5, Doc. 31).

This is not a road line case. The undersigned must examine the facts of this particular case and the specific traffic violation alleged here. If an officer is inclined to fabricate traffic violations, all traffic laws become potential "stop-at-will" mechanisms. However, in the instant case, I have found Officer Lockhart credible, and I conclude the Pacifica was traveling about two feet behind the Federal Express truck at a speed of about 55 miles per hour. Such conduct is very dangerous. Under the circumstances, Jimenez's conduct was a violation of Tenn. Code. Ann. § 55-8-124(a), and the traffic stop at its inception was within Fourth Amendment standards. *See United States v. Sanford*, 476 F.3d 391, 395 (6th Cir. 2007) (holding that a driver violated Tenn. Code. Ann. § 55-8-124 by following another vehicle within ten feet while traveling 65 miles per hour).

14

*C. The Length of the Traffic Stop*

In addition to requiring that a traffic stop be reasonable at its inception, the Fourth Amendment also requires that it be reasonable in scope given the circumstances that justified the stop in the first place. *United States v. Garrido-Santana*, 360 F.3d 565, 571 (6th Cir. 2004); *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). Once the original purpose of the traffic stop has been satisfied, continued detention is not lawful unless police have obtained additional information amounting to reasonable suspicion to believe criminal activity is afoot. *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008); *Blair*, 524 F.3d at 752; *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).

A traffic stop includes those normal activities which are routinely carried out during such a stop, *i.e.* checking the driver's license, registration, and proof of insurance. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *Hill*, 195 F.3d at 269. The driver of a vehicle may be detained until after the officer has finished verifying the driver's license and checking other records as these acts are within the purposes of the initial stop. *See United States v. Ellis*, 497 F.3d 606, 613-14 (6th Cir. 2007) (asking for identification and about one's travel itinerary and purpose of travel was appropriate during traffic stop); *Garrido-Santana*, 360 F.3d. at 573-74 (rejecting defendant's contention that reasonable suspicion was necessary to continue to detain driver after valid traffic stop for speeding in order to conduct computer check of driver's license even though courtesy citation for speeding had already been issued); *United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003) (asking for consent to search did not unreasonably extend the scope of an ordinary traffic stop); *Hill*, 195 F.3d at 269 (driver's license check, which was completed after citation for traffic offense was issued, was within original scope of traffic stop).

Police may also lawfully ask for consent to search and whether the driver possesses contraband during the course of the traffic stop. *See United States v. Palomino*, 100 F.3d 446, 449-50 (6th Cir. 1996); *United States v. Martinez*, 356 F. Supp.2d 856, 863 (M.D. Tenn. 2005).

Defendants argue the traffic stop was unlawfully prolonged and thus consent to search was given during an illegal detention thereby tainting all evidence seized during the search. Fifteen minutes after the initial stop, Officer Lockhart asked for consent to search the vehicle. Leading up to the consent, Lockhart was conducting the normal, permissible activities of a traffic stop. He was running a check on the license, tag and insurance and awaiting the results. He was in the process of writing the warning citation, and he was asking Jimenez about his itinerary. The last thing Lockhart did before asking Jimenez for consent was to attempt to verify the itinerary with the passenger, Espinal-Bisono, and have a quick discussion with Lewis about their itinerary. This effort took about two and a half minutes. Lockhart then asked Jimenez for consent. At this point, the warning citation wasn't finished.

The purpose of the initial traffic stop ends when the officer has collected sufficient information to issue the citation for the initial traffic stop, writes the citation and sends the defendant on his way. *United States v. Torres-Ramos*, 536 F.3d 542, 551 (6th Cir.), *cert. denied*, 129 S.Ct. 772 (2008); *United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008)*; United States v. Jones*, 2008 WL 3244078 (E.D. Tenn. Aug. 6, 2008) (J. Varlan). Thus, the Sixth Circuit in *United States v. Torres-Ramos* found the officer extended the traffic stop for speeding beyond its original purpose when the officer detained the passenger in order to question him regarding vehicle ownership and travel plans after the officer had collected all information necessary to issue the speeding ticket. *Torres-Ramos*, 536 F.3d at 551. Similarly, in the instant case, Officer

16

Lockhart extended the stop about two and a half minutes after he had all the necessary information to complete the warning citation in order to question Espinal- Bisono about his and Jimenez's travel plans and to discuss those plans with Sgt. Lewis. Thus, in order for the continued detention to meet Fourth Amendment standards, Officer Lockhart must have had reasonable suspicion to believe criminal activity was afoot at the time he decided to question Espinal-Bisono regarding his travel itinerary.

Reasonable suspicion to believe criminal activity is afoot must be supported by specific and articulable facts that would "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry v. Ohio*, 392 U.S. , 21-22 (19 ); *Blair*, 524 F.3d at 750. *See also, United States v. Perez*, 440 U.S. 363, 372 (6th Cir. 2006) ("Reasonable suspicion requires specific facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop.") An inchoate or unparticularized suspicion or hunch of criminal activity is insufficient to support reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Blair*, 524 F.3d at 750. The court must "determine whether an officer formed the requisite reasonable, articulable suspicion during a traffic stop under a 'totality of the circumstances' analysis." *United States v. Smith,* 263 F.3d 571, 588 (6th Cir. 2001); *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir.1998) (en banc). In doing so, the court considers the factors as a whole, not separately. *Smith*, 263 F.3d at 588. "This process allows officers to draw on their own training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008) (quoting *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008).

17

At the evidentiary hearing, defendants asserted their situation is similar to *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). In *Mesa*, the defendant, Gina Mesa, was stopped for speeding on the highway. Mesa and her sister, a passenger, appeared nervous. The officer directed her to sit in the back of his police car and asked her a number of questions about where she was going, her age, and her license. Mesa said they were going to visit her grandfather in Nashville, he was not feeling well, and he had had a stroke. The officer questioned the sister separately who said they were going to Nashville to see her grandfather. When he asked if anything was wrong with the grandfather, the sister said, "He's just old." The officer asked if he'd had a heart attack or anything. The sister said he had not. After writing the warning citation, the officer did not allow Mesa to leave the police car and she could not open the door from the inside. The officer then proceeded to ask Mesa if she had any drugs or pistols in the car and if he could look in her car. The defendant consented. The officer then walked a drug dog around the car, but the dog did not alert. Undeterred, the officer searched the interior of the car, under the car, and in the trunk. Mesa then indicated she wished to leave but was not allowed to do so. The officer found a partition in the trunk, opened it, and found cocaine and two firearms inside.

The Sixth Circuit held the search was the product of an illegal detention because Mesa was detained after the traffic stop was completed without the necessary reasonable suspicion to justify further detention. *Id.* at 162-63. The continued detention was based in part on alleged discrepancies between the sister and Mesa regarding their grandfather's health. The Sixth Circuit dismissed this reason stating, "the defendant saying her grandfather had a stroke and her sister's replying in the negative to a question as to whether he had had a heart attack, is simply

18

not a discrepancy sufficient to generate suspicion in the mind of a reasonable police officer." *Id.* at 162. This conclusion left the only basis for the continued detention being the nervousness of Mesa and her sister which the Court held was not sufficient alone to generate the requisite reasonable suspicion. *Id.* at 162 -63.

Lockhart had more than the defendants' nervousness to support reasonable suspicion in this case. The information he received about the defendants' travel plans during the course of the traffic stop simply didn't make sense, and Lockhart knew it. The undersigned takes judicial notice of the fact that I-24 commences in the Chattanooga metropolitan area and runs northwest to Nashville finally ending in Illinois.[3] Atlanta is southeast of Chattanooga. It is not possible to get to Chattanooga from Atlanta on I-24. The interstate route from Atlanta to Chattanooga is I-75. Lockhart tried to obtain an explanation for the implausible route by telling Jimenez that I-75 from Atlanta to Chattanooga was much faster, but Lockhart received no reasonable explanation. The defendant stated something about a friend in Knoxville and going to Chattanooga from Atlanta and on to Connecticut. While he tried, Lockhart was not required to eliminate every innocent reason for the implausible travel plans Jimenez relayed to him. *United States v. McCoy*, 513 F.3d 405, 415 (4th Cir.) (holding officer "was not obligated to eliminate every innocent explanation for his suspicion to be reasonable"), *cert. denied*, 128 S.Ct. 2492 (2008). Jimenez's

---

[3]Fed. R. Evid. 201(b) provides:
A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

purported travel itinerary gave Lockhart reasonable suspicion to believe Jimenez was lying to him about the itinerary and thus the purpose of the trip. Further, Lockhart had also observed the peculiar behavior displayed when Jimenez suddenly slammed on his brakes as Lockhart came up to him in his patrol car on the interstate and the defendants' nervousness and Jimenez's over talkativeness. These factors together gave rise to reasonable suspicion that criminal activity was afoot. I therefore conclude that the brief time it took for Lockhart to question Espinal-Bisono about his travel plans, to consult with Lewis, and to ask Jimenez for consent to search while one defendant waited in the car and another stood unrestrained by the side of the interstate was not unreasonable given the circumstances and did not violate the Fourth Amendment's proscription against unreasonable searches and seizures.

### D. The Consent to Search

It is settled law that consent to search is a permissible exception to the Fourth Amendment's warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), *United States v. Ivy*, 165 F.3d 397, 401 (6th Cir.1998). When police have conducted a warrantless search pursuant to the consent of the defendant, the government has the burden to prove such consent was valid by a preponderance of the evidence using clear and positive proof. *United States v. Henry*, 429 603, 615 n. 16 (6th Cir. 2005); *United States v. Haynes*, 301 F.3d at 669, 682 (6th Cir. 2002). To validly wave the rights secured by the Fourth Amendment, "consent must be free and voluntary." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004); *Ivy,* 165 F.3d at 401. "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion. . . is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *accord Ohio v. Robinette*,

519 U.S. 33, 39 (1996); *Carter,* 378 F.3d at 587.

In his brief, Jimenez argued he does not speak English well enough to have understood what Officer Lockhart was asking him when Officer Lockhart asked to look in the car. However, at the evidentiary hearing, Jimenez did not testify that he did not understand Lockhart's request to search. Rather, Jimenez conceded at the evidentiary hearing that he offered to let Officer Lockhart look into the Pacifica before Lockhart asked for permission and that when Lockhart did ask for permission, he voluntarily gave his consent. Further, the evidence at the evidentiary hearing shows Jimenez had no trouble understanding Lockhart. He responded easily to Lockhart's questions and even joked with Lockhart about looking 29. Thus, assuming Jimenez did not abandon this argument at the evidentiary hearing, this particular argument fails. Not only did Jimenez offer unprompted to allow Lockhart to search when Lockhart did ask, he clearly understood and willingly agreed to it.

### E. The Scope of the Search

Jimenez also argued that the scope of the search, the extended search which included looking into the tire well and opening a compartment by removing bolts, exceeded the permissible scope of the search. "The standard for measuring the scope of the suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *see also, United States v. Purcell,* 526 F.3d 953, 961 (6th Cir. 2008); *United States v. Henry*, 429 F.3d 603, 616 (6th Cir. 2005); *United States v. Garrido-Santana,* 360 F.3d 565, 575-76 (6th Cir. 2004). "The scope of the search is generally

21

defined by its expressed object." *Jimeno*, 500 U.S. at 251; *see also, Henry*, 429 F.3d at 616;

*Garrido-Santana,* 360 F.3d at 576. Thus in *Jimeno*, when a police officer told the driver he (the

officer) had reason to believe there were narcotics in the driver's car immediately before the

officer asked for and received permission to search the car, the permission extended not only to

the surfaces of the vehicle but also to the containers inside the vehicle where a reasonable person

knows that narcotics may be stored. *Jimeno*, 500 U.S. at 251. As the Supreme Court stated,

"[c]ontraband goods are rarely strewn across the trunk or floor of the car." *Id.* The Court noted

"[a] suspect may of course delimit as he chooses the scope of the search to which he consents.

But if his consent would be reasonably understood to extend to a particular container, the

Fourth Amendment provides no grounds for requiring more explicit authorization." *Id.* at 252,

*see also, Garrido-Santana,* 360 F.3d at 576 (search of the gas tank was within scope of search

where general consent was given after officer asked if driver possessed any illegal contraband

such as drugs or stolen goods.) Officer Lockhart specifically asked Jimenez if he had any illegal

drugs. Jimenez said no and offered to let Lockhart look. The scope of the search was then

established. Lockhart's statement, "I am going to take just a quick look," was made *after*

Jimenez gave consent and does not by itself limit the scope of the search. Jimenez knew

Lockhart was looking for contraband, and he gave permission for a general search. As succinctly

stated by the Eighth Circuit, "when the police receive consent to search for items that can be

hidden in different parts of a car, searching those areas is 'objectively reasonable.'" *United States*

*v. Alcantar*, 271 F.3d 731, 738 (8th Cir. 2001). Thus, the undersigned concludes the scope of the

search was not excessive.

22

*F. Withdrawal of Consent*

Jimenez next argues that he attempted to withdraw his consent but was prevented from doing so by the officers. "It is well settled that 'the consenting party ... at any moment may retract his consent.'" *United States v. Buckingham*, 433 F.3d 508, 513 (6th Cir. 2006) (quoting *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999)). In particular Jimenez refers to the incident at seven minutes and 39 seconds into the search when Jimenez approached Sgt. Lewis who waved him back. Jimenez testified he approached Lewis to tell him to stop the search, but Lewis prevented him from doing so. Lewis, on the other hand, testified he had just walked by Jimenez who asked him if something was wrong and Lewis had said, "yes." Lewis testified he thought Jimenez was coming to find out what was wrong. I do not find Jimenez's testimony credible because he had so many other opportunities to tell the officers he wanted the search stopped but he did not. However, even if I were to credit Jimenez's testimony about this particular event, I conclude Lewis simply misunderstood Jimenez's reason for approaching him, and it was reasonable that Lewis did not want Jimenez looking over him while he conducted the search. *See Arizona v. Johnson*,129 S.Ct. 781, 786 (2009) ("the Court has recognized that traffic stops are particularly fraught with danger to police officers.") In any event, 30 seconds after this incident, Lewis walked back to the passenger side of the patrol car. Jimenez could have told Lewis at this time. Moreover, Jimenez had other multiple opportunities after the "wave back" incident to tell either Lockhart, Lewis, or Harvey that he wanted the search stopped. On at least seven occasions after the "wave back" incident but before the contraband was found Lewis or Lockhart or both walked back from the Pacifica to the patrol car. Furthermore, Trooper Harvey was standing next to the defendants during the entire search, and they could have told him they

23

wanted the search stopped. While Harvey told the defendants not to speak in Spanish, he allowed them to speak in English. In fact, Espinal-Bisono, who claims to speak no English, felt comfortable enough to tell Harvey in English that he cleans banks and buildings for a living. Jimenez asked Harvey if the officers were going to put his car back together. Jimenez could have told Harvey then that he wanted the search stopped. There was no coercion or intimidation which would have prevented the defendants from coming forward on these numerous occasions to withdraw consent to search. The officers' demeanor toward the defendants as shown on the video and audio tapes was polite and professional at all times. I do not credit Jimenez's statement that he was handcuffed before the cocaine was found. All the officers testified consistently that he was not; further, their testimony as a whole is consistent with the audio and video evidence of the traffic stop. The officers are not required to read Jimenez's mind. *See e.g., United States v. Hurst*, 228 F.3d 751, 758 n. 3 (6th Cir. 2000) ("Where the record shows defendant expressly consented to the vehicle search, and clearly had the ability and opportunity to expressly withdraw his consent at any time but failed to do so, the officers were objectively justified in construing his flight not as a withdrawal of consent, but as an abandonment of his vehicle, whereby he relinquished any reasonable expectation of privacy in the contents of the vehicle.") Therefore, I conclude defendants' argument that the officers prevented Jimenez from withdrawing his consent also fails.

## IV. Conclusion

For the reasons stated herein, the undersigned concludes the traffic stop at all relevant times, from its inception to its end, was valid under Fourth Amendment standards. The undersigned further finds Jimenez gave a valid, general consent to search the vehicle; the search did not exceed its permissible scope; consent was never withdrawn; and the officers did not prevent defendants from withdrawing consent. Therefore, it is RECOMMENDED the defendants' motions to suppress be DENIED.[4]

Dated: February 23, 2009     *s/William B. Mitchell Carter*

                             UNITED STATES MAGISTRATE JUDGE

---

[4]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).